**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Mark A. Moss, | : | Case No. 3:13 CV 854 |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND** |
|     Defendant, | : | **RECOMMENDATION** |

## I. INTRODUCTION

Plaintiff Mark A. Moss ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination terminating his

receipt of Supplemental Security Income ("SSI") benefits, effective November 30, 2009 (Docket No.

1). Pending are the parties' Briefs on the Merits (Docket Nos. 19 and 20) and Plaintiff's Reply (Docket

No. 21). For the reasons that follow, the Magistrate recommends that the decision of the Commissioner

be affirmed.

## II. PROCEDURAL BACKGROUND

Plaintiff has a rather lengthy and complex history with the Social Security Administration.

Plaintiff was originally granted SSI benefits on November 27, 1990, with a disability onset date of

May 1, 1990 (Docket No. 14, p. 54 of 696). At the time, the Commissioner found Plaintiff's

impairments to be mental retardation and depression, the severity of which met the criteria of Listings

1

12.05B and 12.05C (Docket No. 14, p. 54 of 696). Plaintiff received benefits seemingly without incident for the next seventeen years. On July 30, 2007, for reasons that are unexplained in the record now before this Court, Plaintiff applied for Childhood Disability Benefits ("CDB") under his parents' earning record (Docket No. 14, p. 207 of 696). Plaintiff simultaneously filed an application for Disability Insurance Benefits ("DIB") (Docket No. 14, p. 207 of 696). These two applications triggered an internal investigation with the Social Security Administration known as a Continuing Disability Review ("CDR") (Docket No. 14, p. 207 of 696). On December 21, 2007, Plaintiff's case was referred to the Cooperative Disability Investigations Unit ("CDIU") for further review (Docket No. 11, pp. 357-58 of 696). As the result of a two-day investigation conducted in mid-March 2008 during which a CDIU investigator spoke with Plaintiff's uncle, neighbor, and Plaintiff himself, Plaintiff's case was returned to the Administration for administrative action and disposition (Docket No. 14, pp. 359-64 of 696). Plaintiff's applications for CDB and DIB were denied on May 21, 2008, based on a finding of similar  fault[1] (Docket No. 14, p. 45 of 696).

The CDIU investigation also had repercussions for Plaintiff's ongoing SSI. On September 14, 2009, Plaintiff received notice from the Social Security Administration informing him of its decision to terminate his SSI benefits (Docket No. 14, p. 49 of 696). Plaintiff objected to this decision and requested reconsideration. On April 28, 2011, the Commissioner affirmed the termination of Plaintiff's SSI (Docket No. 14, p. 65 of 696). Plaintiff thereafter filed a timely request for a hearing on May 15,

---

[1] "Similar fault is involved with respect to a determination if – (i) an incorrect or incomplete statement that is material to the determination is knowingly made; or (ii) information that is material to the determination is knowingly concealed." 42 U.S.C. § 1383(e)(7)(B)(i)-(ii). If there is reason to believe that fraud or similar fault is involved in providing evidence, the Commissioner shall disregard any evidence. 42 U.S.C. § 1383(e)(7)(A)(ii). If, after a finding of fraud or similar fault, the Commissioner finds insufficient evidence to support benefits, the Commissioner may terminate eligibility or treat payments made on the basis of insufficient evidence as overpayments. 42 U.S.C. § 1383(e)(7)(C).

2

2011 (Docket No. 14, p. 68 of 696).

On February 14, 2012, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Gabrielle Vitellio ("ALJ Vitellio") (Docket No. 14, pp. 648-96 of 696). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 14, pp. 691-96 of 696). In a decision dated April 27, 2012, ALJ Vitellio affirmed the termination of Plaintiff's SSI (Docket No. 14, pp. 27-37 of 696). Plaintiff appealed (Docket No. 14, p. 13 of 696). The Appeals Council affirmed the ALJ's decision on February 19, 2013, making the ALJ's decision the final decision of the Commissioner (Docket No. 14, p. 7 of 696).

On April 17, 2013, Plaintiff filed a Complaint in the Northern District of Ohio, Western Division, seeking judicial review of his termination of SSI (Docket No. 1). In his pleading, Plaintiff alleged the ALJ erred: (1) in finding medical improvement without proper analysis of Plaintiff's case under Listing 12.05C; and (2) in her assessment of Plaintiff's residual functional capacity by failing to consider Plaintiff's subjective experience of pain and further mental limitations (Docket No. 19). Defendant filed its Answer on August 2, 2013 (Docket No. 13).

### III.  FACTUAL BACKGROUND

**A.  THE ADMINISTRATIVE HEARING**

An administrative hearing convened on February 14, 2012, in Toledo, Ohio (Docket No. 14, pp. 648-96 of 696). Plaintiff, represented by counsel Mary T. Meadows, appeared and testified (Docket No. 14, pp. 654-90 of 696). Also present and testifying was VE Jacquelyn D. Schabacker ("VE Schabacker") (Docket No. 14, pp. 690-96 of 696).

**1.  PLAINTIFF'S TESTIMONY**

At the time of the hearing, Plaintiff was fifty years old and residing with his uncle (Docket No.

3

14, p. 655 of 696). He did not have any children (Docket No. 14, p. 655 of 696). Plaintiff stated that he graduated from high school through the "slow learner" program which allowed him to earn a diploma based on his ability to work rather than complete classwork (Docket No. 14, pp. 685, 687 of 696). Plaintiff indicated he had received health insurance since October 2009 through programs provided by the Department of Job and Family Services (Docket No. 14, pp. 655-56 of 696).

        With regard to his work history, Plaintiff testified that his migraines, dizzy spells, and bone issues prevented him from working (Docket No. 14, p. 656 of 696). His last job was in 2006 and involved going door to door collecting voter ballots (Docket No. 14, pp. 674-75 of 696). Plaintiff indicated he only worked for seven or eight days before being terminated for not working fast enough (Docket No. 14, pp. 674-75 of 696). Plaintiff also stated that he worked for the Lucas County Metropolitan Housing Authority from 1998 through 2000 doing maintenance work (Docket No. 14, p. 675 of 696). Plaintiff indicated that, over the years, he worked approximately twenty to thirty temporary jobs (Docket No. 14, p. 684 of 696).

        Plaintiff testified about his physical health issues, including his migraine headaches and bone issues. Plaintiff reported that he was under the care of Dr. Tina Blitz ("Dr. Blitz") for his migraines and had last seen her in December 2011 (Docket No. 14, pp. 660-61 of 696). Plaintiff also reported that Dr. Blitz was treating him for an unknown nerve condition that caused his mouth to be in pain (Docket No. 14, p. 664 of 696).

        With regard to his bone issues, Plaintiff indicated that he suffered from a pinched nerve in 2009 which caused him to use crutches (Docket No. 14, p. 662 of 696). Plaintiff also claimed to need a walker due to a painful and swollen right knee, which had to be drained of fluid at regular intervals (Docket No. 14, pp. 658-59 of 696). Later, Plaintiff testified that, upon the recommendation of his

4

doctor, he was walking more, and doing so without the use of a walker (Docket No. 14, p. 677 of 696). According to Plaintiff, he would walk around the block and in parks (Docket No. 14, p. 677 of 696).

Plaintiff noted that he suffered from asthma and sleep apnea and required the assistance of three inhalers and a continuous positive airway pressure ("CPAP") machine (Docket No. 14, p. 679 of 696). Plaintiff also indicated that he had a severe astigmatism which allowed him to see but gave him difficulty when he tried to read (Docket No. 14, p. 681 of 696). When asked about activities of daily living, Plaintiff indicated he could cook if he used a chair, wash himself, socialize with others, and occasionally go to church (Docket No. 14, pp. 668-72 of 696).

### 2.    VOCATIONAL EXPERT TESTIMONY

Having familiarized herself with Plaintiff's file and vocational background prior to the hearing, the VE indicated that Plaintiff had no past relevant work (Docket No. 14, p. 691 of 696). ALJ Vitellio then posed her first hypothetical question: "I have a younger individual with a high school education, light work. Please give me three positions with DOT[2] numbers and national and local numbers" (Docket No. 14, p. 691 of 696). The VE testified that, given these limitations, an individual could work as a: (1) cleaner, listed under DOT 323.687-014, for which there are 450,000 positions nationally and 5,000 locally; (2) sorter, listed under DOT 788.687-106, for which there are 120,000 positions nationally and 2,000 locally; and (3) bench assembler, listed under DOT 729.687-010, for which there are 120,000 positions nationally and 2,000 locally (Docket No. 14, p. 691 of 696).

For her second hypothetical, ALJ Vitellio added a sit/stand option to the original list of limitations (Docket No. 14, p. 691 of 696). The VE testified that, with this additional limitation, other work positions included: (1) inspection positions, listed under DOT 559.687-074, for which there are

---

[2] Dictionary of Occupational Titles.

1,000 positions locally;[3] (2) cashier, listed under DOT 211.462-010, for which there are 230,000 positions nationally and 3,000 locally; and (3) bench assembler, listed under DOT 929.587-010, for which there are 80,000 positions nationally and 1,000 locally (Docket No. 14, pp. 691-92 of 696). The VE indicated that these positions allowed for two fifteen-minute unscheduled breaks during a normal eight-hour day (Docket No. 14, p. 692 of 696). She also testified that these positions could be performed sitting or standing (Docket No. 14, p. 692 of 696).

During cross examination, Plaintiff's counsel changed the ALJ's second hypothetical to sedentary, rather than light, work (Docket No. 14, p. 693 of 696). The VE testified that there would be jobs available at this level, including: (1) surveillance system monitor, listed under DOT 379.367-010, for which there are 31,000 positions nationally and 500 locally; (2) sorter inspector, listed under DOT 788.687-022, for which there are 80,000 positions nationally and 1,000 locally; and (3) information clerk, listed under DOT 237.367-046, for which there are 120,000 positions nationally and 100 locally (Docket No. 14, p. 694 of 696).

## B.   MEDICAL RECORDS

### 1.   MENTAL HEALTH RECORDS

Plaintiff's mental health records for the relevant time period date back to August 15, 1990, when Plaintiff, then twenty-nine years old, saw psychologist Richard N. Davis ("Dr. Davis") at the request of the Bureau of Disability Determination ("BDD") (Docket No. 14, p. 208 of 696). Plaintiff noted that he graduated from high school but was in special education classes (Docket No. 14, p. 209 of 696). He was last employed as a "flag man" for the Ohio Department of Transportation, but did not see himself as employable, citing issues with standing, walking without a cane, weakness, dizziness,

---

[3] The VE did not provide national employment numbers for this position.

and neurological and bone difficulties (Docket No. 14, p. 209 of 696). Plaintiff stated that he was renting a room from his aunt (Docket No. 14, p. 209 of 696).

Dr. Davis noted that Plaintiff presented with an average to shabby appearance (Docket No. 14, p. 209 of 696). Plaintiff was cooperative but "extremely limited intellectually" (Docket No. 14, p. 209 of 696). He spoke slowly and had a tendency to ramble (Docket No. 14, p. 209 of 696). Dr. Davis also noted fragmentation of thoughts, but no flight of ideas (Docket No. 14, p. 209 of 696). Plaintiff spoke coherently and his thoughts were relevant and organized with some minor poverty of speech but no perseveration (Docket No. 14, p. 209 of 696). Plaintiff indicated that he was always anxious but did not fidget during the evaluation (Docket No. 14, p. 210 of 696). Plaintiff also noted that he was always preoccupied with his health issues (Docket No. 14, p. 210 of 696). Dr. Davis reported that Plaintiff obsessed about his physical problems and misinterpreted questions and responded to questions that were not asked (Docket No. 14, p. 210 of 696). However, Plaintiff knew the year, month, day of the week, and the current and past president of the United States (Docket No. 14, p. 210 of 696).

Dr. Davis made a number of conclusions based on his evaluation of Plaintiff. Although Plaintiff was oriented to person, place, time, and situation, Dr. Davis noted that Plaintiff presented with a very strange affect (Docket No. 14, p. 211 of 696). Plaintiff was very concerned about his physical health and constantly discussed his physical problems (Docket No. 14, p. 211 of 696). Dr. Davis noted that Plaintiff would have a difficult time relating to others because of his obsession with discussing his physical health issues (Docket No. 14, p. 211 of 696). Dr. Davis was unable to say for certain if Plaintiff would be able to understand and follow simple oral directions or perform simple, repetitive tasks, but did note that Plaintiff would be unlikely to withstand even the "slightest amount" of stress and pressure related to daily work activity (Docket No. 14, p. 211 of 696). Dr. Davis diagnosed

7

Plaintiff with somatization disorder and schizophrenia (paranoid type), and assigned him a Global

Assessment of Functioning ("GAF") score of forty[4] (Docket No. 14, p. 211 of 696). Intelligence

testing revealed Plaintiff's verbal IQ score of sixty, performance IQ score of fifty-three, and a full-

scale IQ score of fifty-three (Docket No. 14, p. 213 of 696). Dr. Davis diagnosed Plaintiff with mild

mental retardation (Docket No. 14, p. 214 of 696).

Seventeen years later, on October 11, 2007, Plaintiff was again referred to Dr. Davis for

evaluation and intelligence testing (Docket No. 14, p. 332 of 696). Dr. Davis noted that Plaintiff still

seemed "very much preoccupied and obsessed" with his physical ailments (Docket No. 14, p. 335 of

696). Plaintiff was basically cooperative but had a difficult time presenting valid information (Docket

No. 14, p. 334 of 696). Plaintiff's flow of conversation was slow and he had a tendency to ramble

(Docket No. 14, p. 334 of 696). He did not appear to understand the purpose of the examination

(Docket No. 14, p. 334 of 696). Plaintiff knew the year, date, month, and past two presidents, but could

not do serial sevens (Docket No. 14, p. 335 of 696).

When Dr. Davis asked about activities of daily living, Plaintiff indicated he: (1) cooked for

himself and did dishes, laundry, and some cleaning; (2) bathed, changed his clothes, and dressed daily;

(3) liked to read magazines pertaining to music; (4) watched television three to four hours per day; (5)

did yard work and grocery shopping; (6) had a few friends and attended church a few times per year;

and (7) tried to exercise (Docket No. 14, p. 335 of 696). Updated intelligence testing revealed a verbal

IQ score of seventy, a performance IQ score of fifty-six, and a full-scale IQ score of sixty-one (Docket

---

[4]The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

No. 14, p. 336 of 696). Dr. Davis diagnosed Plaintiff with polysubstance dependence, adjustment

disorder with anxiety and depression, and lower borderline intellectual functioning, and assigned him a

GAF score of fifty-five[5] (Docket No. 14, p. 337 of 696).

With regard to work-related mental activities, Dr. Davis concluded that Plaintiff was mildly

impaired in his ability to relate to others given his intellectual limitations (Docket No. 14, p. 338 of

696). He also concluded that Plaintiff was moderately to markedly impaired in his ability to follow

instructions (Docket No. 14, p. 338 of 696). Dr. Davis found that Plaintiff would probably be able to

understand and follow some simple instructions, but noted that Plaintiff had difficulty following

simple instructions in his office during the evaluation (Docket No. 14, p. 338 of 696). Plaintiff was

also moderately to markedly impaired in his ability to perform a simple repetitive task and mildly to

moderately impaired in dealing with the stress and pressure of a work setting (Docket No. 14, p. 338 of

696).

### 2.    PHYSICAL HEALTH RECORDS

#### a.    MIGRAINE HEADACHES

Plaintiff's relevant physical health records concerning his migraines date back to February 11,

2004, when Plaintiff saw neurologist Dr. Faizan Hafeez, MD ("Dr. Hafeez") complaining of frequent

headaches accompanied by episodic dizziness (Docket No. 14, p. 239 of 696). Plaintiff was awake,

alert, and oriented to person, place, time, and circumstance (Docket No. 14, p. 240 of 696). Dr. Hafeez

noted that Plaintiff had normal attention and concentration (Docket No. 14, p. 240 of 696). Plaintiff

admitted to drinking alcohol, smoking cigarettes, and using marijuana once a month (Docket No. 14, p.

---

[5] A GAF score of 55 indicates moderate symptoms or moderate difficulty in social, occupational,
or school functioning. DSM-IV at 34.

240 of 696).

On May 18, 2004, Plaintiff saw neurologist Dr. Sushanath Bhat, MD ("Dr. Bhat") complaining of long-term headaches (Docket No. 14, p. 236 of 696). Plaintiff reportedly told Dr. Bhat that he had suffered from headaches for the past thirty years (Docket No. 14, p. 236 of 696). Plaintiff reported his headaches occurred daily and described them as throbbing and pulsating and accompanied by nausea, vomiting, photophobia, and phonophobia (Docket No. 14, p. 237 of 696). Plaintiff admitted to being non-compliant with his medications and to smoking and drinking alcohol, as well (Docket No. 14, p. 237 of 696). Plaintiff's examination was normal and Dr. Bhat reported that Plaintiff's higher mental functions were within normal limits (Docket No. 14, p. 238 of 696). On December 22, 2004, Plaintiff saw Dr. Imran Ali, MD ("Dr. Ali") complaining of ongoing headaches (Docket No. 14, p. 231 of 696). Plaintiff's examination was normal and he was started on Neurontin (Docket No. 14, p. 233 of 696).

On April 13, 2005, Plaintiff saw neurologist Dr. Salman Wali, MD ("Dr. Wali") (Docket No. 14, p. 227 of 696). Plaintiff's examination was normal and Dr. Wali prescribed an increase in Plaintiff's anti-depressant (Docket No. 14, p. 231 of 696). Plaintiff was also scheduled for an inpatient dihydroergotamine ("DHE")[6] treatment for his migraines (Docket No. 14, p. 230 of 696). Plaintiff returned to Dr. Wali on June 28, 2005, still complaining of headaches (Docket No. 14, p. 227 of 696). Plaintiff's examination was normal and he was started on Effexor (Docket No. 14, p. 228 of 696).

Plaintiff did not return to Dr. Wali until February 28, 2006 (Docket No. 14, p. 225 of 696). His examination was normal, but Dr. Wali referred Plaintiff for an MRI (Docket No. 14, p. 226 of 696). This MRI took place on March 6, 2006, and produced normal results (Docket No. 14, pp. 245, 292 of

---

[6] A medicinal substance derived from ergot used in the treatment of migraine headaches. It is given by injection into the soft tissues, especially into the muscles. ATTORNEYS' DICTIONARY OF MEDICINE, D-34717 (2009).

10

696). During an appointment on January 26, 2007, Plaintiff noted a sensitivity to light associated with his headaches, but no nausea, vomiting, or focal or neurological deficits (Docket No. 14, p. 223 of 696). Plaintiff stated that he had been on numerous prophylactic medications, but only tried them for a few weeks before determining they were ineffective (Docket No. 14, p. 223 of 696). Plaintiff's examination was normal and Dr. Wali started him on Relpax (Docket No. 14, p. 224 of 696).

Plaintiff's next medical record dealing with migraine headaches was not until October 18, 2011, when Plaintiff had another MRI of his brain (Docket No. 14, p. 598 of 696). The scan showed scattered punctate non-specific subcortical cerebral white matter hyperintensities and some vertebral basilar tortuosity (Docket No. 14, p. 598 of 696). Plaintiff's scan was found to be largely normal and unremarkable (Docket No. 14, p. 598 of 696).

### b.    BONE/JOINT ISSUES

Plaintiff's medical records dealing with his bone and joint issues date back to October 21, 2004, when Plaintiff had an x-ray of his cervical spine with normal results (Docket No. 14, p. 248 of 696). On January 2, 2006, Plaintiff had an x-ray of his right ankle, which revealed soft tissue swelling adjacent to the lateral malleolus (Docket No. 14, p. 288 of 696). Records show that the scan was otherwise normal (Docket No. 14, p. 288 of 696). On February 12, 2006, Plaintiff had an x-ray of his right foot (Docket No. 14, p. 291 of 696). The scan showed an accessory ossicle adjacent to the cuboid and a possible small anterior ankle joint effusion (Docket No. 14, p. 291 of 696). On July 27, 2006, Plaintiff had an x-ray of his lower left leg, which was normal (Docket No. 14, p. 290 of 696). Plaintiff had an x-ray of his lumbosacral spine on January 10, 2007, which showed bilaterally symmetrical sacroiliac joints and no acute bony abnormalities (Docket No. 14, p. 285 of 696). A January 28, 2007, x-ray of Plaintiff's right hand was normal (Docket No. 14, p. 286 of 696).

11

Plaintiff began treatment with orthopedist Dr. Robert L. Kalb, MD ("Dr. Kalb") on July 31, 2007 (Docket No. 14, p. 444 of 696). Plaintiff saw Dr. Kalb numerous times over a period of four years for a variety of issues including thumb pain, bilateral knee pain, hip pain, and right foot pain (Docket No. 14 pp. 444-526 of 696). Plaintiff began complaining of bilateral knee pain in August 2007 (Docket No. 14, p. 521 of 696). He described this pain as moderate until October 2008, when he rated it as a seven out of a possible ten (Docket No. 14, p. 479 of 696). The pain became as intense as a ten in September 2010 (Docket No. 14, p. 458 of 696), but subsided to a seven or eight by December 2010 (Docket No. 14, p. 452 of 696). On March 4, 2011, Plaintiff had a right knee arthroscopy (Docket No. 14, p. 434 of 696). He was diagnosed with right knee advanced osteoarthritis, a degenerative tear in his medial lateral meniscus, loose cartilage fragments, and chondromalacia patella (Docket No. 14, p. 434 of 696). By December 23, 2011, Plaintiff's bilateral knee pain had lessened to a two and three, left and right, respectively (Docket No. 14, p. 583 of 696).

Plaintiff's hip pain began in September 2007 and was initially described as mild (Docket No. 14, p. 516 of 696). By January 2008, Plaintiff described the pain as "constant and excruciating" (Docket No. 14, p. 506 of 696). By December 2010, the pain had subsided to a four out of a possible ten (Docket No. 14, p. 452 of 696). On December 23, 2011, Dr. Kalb reported that Plaintiff's bilateral hip pain had been resolved (Docket No. 14, p. 583 of 696). Plaintiff's right foot pain began in April 2008 and was also initially described as mild (Docket No. 14, p. 498 of 696). By January 2009, Plaintiff rated his pain as a one out of possible ten (Docket No. 14, p. 475 of 696) and Plaintiff stopped complaining of right foot pain altogether by September 2010 (Docket No. 14, p. 458 of 696). Plaintiff always presented with a limp but was initially described as having a satisfactory heel-toe gait (Docket No. 14, p. 444 of 696). In February 2008, Dr. Kalb began describing Plaintiff's gait as "limited"

12

(Docket No. 14, p. 504 of 696).

During all of Plaintiff's appointments with Dr. Kalb, it was reported that Plaintiff was oriented to person, place, and time, and his mood and affect were always normal (Docket No. 14, pp. 444-526 of 696). Plaintiff's ultimate diagnosis grew and changed over time, but his final diagnosis, reported on December 23, 2011, was as follows: (1) right thumb gout; (2) bilateral hip osteoarthritis, grade II; (3) bilateral knee osteoarthritis, grade IV; (4) patella femoral osteoarthritis, grade IV; (5) left foot MP osteoarthritis, grade IV; (6) hip bursitis bilateral; (7) low back pain and lumbar degenerative disc disease at L5-S1; (8) spondylolisthesis, grade I; (9) smoker; (10) high blood pressure; (11) scoliosis, grade I; (12) glaucoma; (13) obesity; and (14) cervical spine degenerative disc disease (Docket No. 14, p. 585 of 696).

### c.   SLEEP APNEA

Plaintiff underwent a sleep disorder study on April 8, 2008 (Docket No. 14, p. 383 of 696). While Plaintiff was reported to snore, there was no evidence of significant obstructive sleep apnea and no treatment was ordered (Docket No. 14, p. 383 of 696). Plaintiff had another sleep disorder study on April 27, 2010, which did diagnose obstructive sleep apnea (Docket No. 14, pp. 604-05 of 696). Plaintiff was started on a treatment of CPAP therapy calibrated at 10cm $H_2O$ (Docket No. 14, pp. 604-05 of 696). Plaintiff again underwent a sleep disorder study on November 29, 2010 (Docket No. 14, p. 429 of 696). This study found Plaintiff's obstructive sleep apnea to be resolved with CPAP titration at 11cm $H_2O$ (Docket No. 14, p. 429 of 696). Plaintiff was also diagnosed with periodic limb movement disorder and restless leg syndrome (Docket No. 14, p. 429 of 696).

On March 23, 2011, Plaintiff saw Dr. Hany J. Jacob, MD ("Dr. Jacob") to follow up on his sleep apnea (Docket No. 14, p. 553 of 696). At that time, Plaintiff reported erratic compliance with his

CPAP therapy (Docket No. 14, p. 553 of 696). During a September 29, 2011, visit with Dr. Jacob, Plaintiff reported that he had discontinued CPAP therapy for several months (Docket No. 14, p. 550 of 696). Dr. Jacob recommended Plaintiff resume therapy at 12cm $H_2O$ (Docket No. 14, p. 551 of 696). By mid-December 2011, Plaintiff was reporting overall compliance with his CPAP therapy at 12cm $H_2O$ (Docket No. 14, p. 549 of 696).

## C. EVALUATIONS

### 1. PSYCHIATRIC REVIEW TECHNIQUES

On November 8, 2007, Plaintiff underwent a Psychiatric Review Technique with state examiner Dr. Todd Finnerty, Psy.D ("Dr. Finnerty") (Docket No. 14, pp. 340-53 of 696). Dr. Finnerty seemed to conclude that Plaintiff met Listing 12.05B, although only the first page of the evaluation was completed (Docket No. 14, p. 340 of 696). Dr. Finnerty attempted a second Psychiatric Review Technique on May 19, 2008, but was unable to complete the evaluation due to insufficient evidence (Docket No. 14, pp. 385-98 of 696). In his notes, Dr. Finnerty recommended that the Administration disregard Plaintiff's own statements regarding his functioning as well as the psychological consultative examinations with Dr. Davis in 1990 and 2007 (Docket No. 14, p. 397 of 696). Dr. Finnerty noted that Plaintiff's "work history and history of criminal activity is not consistent with someone with mental retardation. [Plaintiff's] statements regarding his physical and psychological symptoms are misleading in order to obtain benefits for which [Plaintiff] is not entitled to" (Docket No. 14, p. 397 of 696).

On March 8, 2010, Plaintiff underwent a third Psychiatric Review Technique with Dr. Mel M. Zwissler, Ph.D ("Dr. Zwissler") (Docket No. 14, pp. 403-16 of 696). Dr. Zwissler concluded that Plaintiff had no severe impairments (Docket No. 14, p. 403 of 696). Like Dr. Finnerty, Dr. Zwissler noted that Plaintiff's "work history and history of criminal activity is not consistent with someone who

14

is mentally retarded. [Plaintiff's] statements regarding his physical and psychological symptoms are misleading in order to obtain benefits to which [Plaintiff] is not entitled" (Docket No. 14, p. 415 of 696).

### 2. PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On March 17, 2010, Plaintiff underwent a Physical Residual Functional Capacity Assessment with state examiner Dr. W. Jerry McCloud, MD ("Dr. McCloud") (Docket No. 14, pp. 417-24 of 696). Dr. McCloud concluded that Plaintiff could: (1) occasionally lift twenty pounds; (2) frequently lift ten pounds; (3) stand and/or walk for a total of two hours during an eight-hour workday; (4) sit for a total of six hours during an eight-hour workday; and (5) engage in unlimited pushing and pulling (Docket No. 14, p. 418 of 696). While Plaintiff could never climb ladders, ropes, or scaffolds, Dr. McCloud concluded that he could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl (Docket No. 14, p. 419 of 696). Dr. McCloud suggested that Plaintiff avoid concentrated exposure to extreme cold and heat, wetness, humidity, and fumes, odors, dusts, gases, and poor ventilation (Docket No. 14, p. 421 of 696). Plaintiff had no manipulative, visual, or communicative limitations (Docket No. 14, pp. 420-21 of 696).

### IV. STANDARD OF DISABILITY

In cases where a current DIB recipient is challenging the cessation of his disability benefits, the central issue is whether the recipient's medical impairments have improved to the point where he or she is able to perform substantial gainful activity. 42 U.S.C. § 423(f)(1). Therefore, the evaluation of any such improvement is a two-part process. *See Kennedy v. Astrue*, 247 F.App'x 761, 764 (6th Cir. 2007). First, the Commissioner must determine if the recipient has experienced actual medical improvement. For purposes of Social Security, medical improvement is "any decrease in the medical

severity of [the recipient's] impairment(s) . . ." 20 C.F.R. § 404.1594(b)(1). Improvement is measured against a baseline status of the recipient's impairment(s), which is determined as of the date of the recipient's "most recent favorable medical decision that [the recipient] was disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1)(i). This determination "must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the recipient's] impairment(s)." 20 C.F.R. § 404.1594(b)(1).

The second part of the cessation analysis focuses on whether, based on his or her medical improvement, the recipient has the ability to engage in substantial gainful activity. *Kennedy*, 247 F.App'x at 765. Medical improvement is only related to a recipient's ability to do work if "there has been a decrease in the severity . . . of the impairment(s) present at the time of the most recent favorable medical decision and an increase in [the recipient's] functional capacity to do basic work activities." 20 C.F.R. § 416.994(b)(1)(iii). At this stage, the Commissioner must incorporate the standards set forth in the regulations governing *initial* disability determinations. *See* 20 C.F.R. § 404.1594(b)(5), (7). The difference between initial and termination determinations is that, in termination proceedings, the ultimate burden of proof rests with the Commissioner. *Kennedy*, 247 F.App'x at 765. An increase in the recipient's residual functional capacity will lead to a cessation of benefits only if, as a result of this increase, the recipient can perform other work that exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1594(f)(8), 416.994(b)(5)(viii).

To determine whether a recipient's entitlement to disability benefits has ended, the Commissioner uses the eight-step sequential evaluation process outlined in 20 C.F.R. §§ 404.1594(f)(1)-(8), 416.994(b)(5)(i)-(viii). *See Kennedy*, 247 F.App'x at 764. First, the Commissioner must determine whether the recipient is currently engaging in substantial gainful activity and, if not,

16

whether the disability continues because the recipient's impairment(s) meet or equal the severity of a listed impairment. 20 C.F.R. § 404.1594(f)(1), (2). Next, the Commissioner must determine whether there has been any medical improvement. 20 C.F.R. § 404.1594(f)(3). If so, the Commissioner must determine whether the medical improvement is related to the recipient's ability to work. 20 C.F.R. § 404.1594(f)(4). If there has been no medical improvement or if the improvement is *not* related to the recipient's ability to work, the Commissioner must determine whether any exception to medical improvement applies. 20 C.F.R. § 404.1594(f)(5). If there *is* medical improvement related to the recipient's ability to work, the Commissioner must determine whether all of the recipient's current impairments in combination are severe. 20 C.F.R. § 404.1594(f)(6). If the impairment or combination of impairments is severe, the Commissioner must determine whether the recipient has the residual functional capacity to perform any of his or her past relevant work. 20 C.F.R. § 404.1594(f)(7). Finally, if the recipient is unable to do past relevant work, the Commissioner must determine whether he or she can perform other work. 20 C.F.R. §§ 404.1594(f)(8). There is no presumption of continuing disability. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286-87 n.1 (6th Cir. 1994).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Vitellio made the following findings:

1. The most recent favorable medical decision finding that Plaintiff was disabled is the determination dated November 27, 1990. This is known as the comparison point decision ("CPD").

2. At the time of the CPD, Plaintiff had the following medically determinable impairments: mental retardation and depression. These impairments were found to meet section(s) 12.05B and 12.05C of 20 CFR Part 404, Subpart P, Appendix 1.

3. The medical evidence establishes that, as of September 1, 2009, Plaintiff had the following medically determinable impairments: status-post right knee arthroscopy,

17

degenerative disc disease of the cervical spine, trigeminal neuralgia, lumbar disc disease, bilateral knee arthritis, and borderline intellectual functioning.

4. Since September 1, 2009, Plaintiff has not had an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Medical improvement occurred as of September 1, 2009.

6. Plaintiff's medical improvement is related to the ability to work because, as of September 1, 2009, Plaintiff's CPD impairment(s) no longer met or medically equaled the same listing(s) that was met at the time of the CPD.

7. Beginning September 1, 2009, Plaintiff has continued to have a severe impairment or combination of impairments.

8. Beginning September 1, 2009, based on the current impairments, Plaintiff has had the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b) except Plaintiff is limited to work with a sit/stand option and unskilled work due to borderline intellectual functioning.

9. Plaintiff has no past relevant work.

10. On September 1, 2009, Plaintiff was a younger individual age 18-49.

11. Plaintiff has at least a high school education and is able to communicate in English.

12. Transferability of job skills is not an issue because Plaintiff does not have past relevant work.

13. Beginning September 1, 2009, considering Plaintiff's age, education, work experience, and residual functional capacity based on the current impairments, Plaintiff has been able to perform a significant number of jobs in the national economy.

14. Plaintiff's disability ended on November 30, 2009, and Plaintiff has not become disabled again since that date.

(Docket No. 14, pp. 27-37 of 696). ALJ Vitellio denied Plaintiff's request for continuation of SSI benefits (Docket No. 14, p. 37 of 696).

18

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42

U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-

33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's

conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact

that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27

(6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial

evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs*., 966 F.2d 1028,

1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because

there exists in the record substantial evidence to support a different conclusion . . . This is so because

there is a 'zone of choice' within which the Commissioner can act, without the fear of court

interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.

2001) (citations omitted)).

## VII. DISCUSSION

### A.    PLAINTIFF'S ALLEGATIONS

In his Brief on the Merits, Plaintiff alleges that the ALJ erred: (1) in finding medical

improvement without analysis of whether Plaintiff continued to meet Listing 12.05C; and (2) in her

assessment of Plaintiff's residual functional capacity by failing to consider Plaintiff's experience of

pain and other symptoms and limitations (Docket No. 19).

**B.**     **DEFENDANT'S RESPONSE**

Defendant disagrees and argues that Plaintiff's condition medically improved given his current adaptive functioning capabilities (Docket No. 20, pp. 12-15 of 19). Furthermore, Defendant contends that there is substantial evidence to support the ALJ's finding that Plaintiff retained the residual functional capacity to perform unskilled light work with a sit/stand option (Docket No. 20, pp. 15-17 of 19).

**C.**     **DISCUSSION**

**1.**     **MEDICAL IMPROVEMENT**

Plaintiff contends the ALJ erred by finding that Plaintiff medically improved without conducting any analysis as to whether Plaintiff continued to meet Listing 12.05(C) (Docket No. 19, pp. 8-12 of 16). According to Plaintiff, he continues to possess the requisite IQ score, additional severe impairment, and, most notably, deficits in adaptive functioning required to meet the Listing (Docket No. 19, pp. 8-12 of 16). Defendant refutes this allegation (Docket No. 20, pp. 12-15 of 19). Plaintiff's argument is without merit.

When determining whether a claimant is disabled for purposes of awarding disability, the Commissioner must determine whether one, or a combination of more than one, of a claimant's severe impairments either meets or are equivalent in severity to one or more the "listed" medical conditions. 20 C.F.R. §§ 404.1520(d), 416.920(d). These "listed" medical conditions "describes for each of the major body systems impairments that [the Social Security Administration] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of . . . her age, education, or work experience." 20 C.F.R. § 404.1525(a). Within each listing, the Social Security Administration specifies the medical and other findings needed to satisfy the criteria of that particular listing. 20

20

C.F.R. § 404.1525(c)(3). A claimant's impairment meets a listed impairment only when it manifests the specific findings described in the set of medical criteria for the particular listed impairment. 20 C.F.R. §§ 404.1525(d), 416.925(d). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). It is the *claimant's* burden to bring forth evidence to establish that she meets or equals a listed impairment. *See Evans v. Sec'y of Health and Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1981) (per curiam).

A finding of mental retardation is found generally under Listing 12:00: Mental Disorders. In the introduction to this section, the Social Security Administration states:

> The structure of the listing for intellectual disability (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing . . . For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(C) and 416.920(C). If the additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(C) and 416.920(C), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work.

20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00.

Plaintiff's specific impairment is found under Listing 12.05(C): Intellectual Disability. Under this section,

> intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22 [and] -- (C) A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other

mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Part 404, Subpart P, Appendix 1, 12.05(C). Here, Plaintiff meets the specific criteria of subsection (C) without difficulty. His most recent evaluation shows a verbal IQ score of seventy, a performance IQ score of fifty-six, and a full-scale IQ score of sixty-one (Docket No. 14, p. 336 of 696). These scores adequately meet the requirements of Listing 12.05(C). Furthermore, ALJ Vitellio herself acknowledged that Plaintiff had an additional physical or mental impairment that imposed an additional and significant work-related limitation of function, namely, Plaintiff's status-post right knee arthroscopy, degenerative disc disease of the cervical spine, trigeminal neuralgia, lumbar disc disease, and bilateral knee arthritis (Docket No. 14, p. 29 of 696). Therefore, the specific requirements of subsection (C) are met. Rather, it is the criteria of the *introductory* paragraph, namely Plaintiff's deficits in adaptive functioning, that is at issue.

According to the ALJ, although Plaintiff was, at one time, diagnosed with mild mental retardation, the current relevant evidence suggests that Plaintiff currently only suffers from borderline intellectual functioning:

> [Plaintiff] reported that he graduated without special education services and he is able to read a newspaper. On October 11, 2007, consultative examiner Dr. Davis evaluated [Plaintiff] and noted that although [Plaintiff] was cooperative, he was difficult to obtain information. His flow of conversation and thought was very slow and he tended to ramble. Fragmentation of thoughts was noted as well as some flight of ideas. He had difficulty sleeping and reported feelings of worthlessness and hopelessness. He did not display signs of anxiety. He appeared very much preoccupied and obsessed with his health problems. [Plaintiff] was administered intelligence testing which yielded a full-scale IQ of 61 and a verbal IQ of 70. The consultant examiner diagnosed [Plaintiff] with lower borderline intellectual functioning, adjustment disorder with anxiety, depression, and polysubstance dependence. He concluded that [Plaintiff] was capable to understand, retain, and follow simple tasks. The undersigned finds that the medical opinion of Dr. Davis is not consistent with the evidence of record. Dr. Davis assessed [Plaintiff] with a GAF score of 61. A GAF score from 51 to 60 is indicative of moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning . . . The undersigned finds that this assessment is not

22

> consistent with the evidence of record. [Plaintiff] reported that he cooked for himself, he did his own dishes, the laundry and he helped to clean. He also reported that he bathed, changed his clothing and dressed daily. He liked to read magazines pertaining to music. He was interested in singing and studying the piano. He watched television three to four hours per day. He did yard work and grocery shopped. The undersigned gives little weight to the medical opinion of Dr. Davis, in accordance with SSR 96-6p. However, the undersigned finds that the evidence supports that the claimant has borderline intellectual functioning and that this impairment further supports that [Plaintiff] is limited to unskilled work activity.

(Docket No. 14, p. 34 of 696). The Magistrate would agree.

During his 2007 evaluation with Dr. Davis, Plaintiff noted that he was most recently employed in 2006 by the Board of Elections doing door to door canvassing, a seemingly rather social occupation (Docket No. 14, p. 333 of 696). He admitted that he, at one time, had been consistently employed as long as four to five years and did not have difficulty getting along with coworkers or supervisors (Docket No. 14, p. 334 of 696). Although he seemingly had some trouble concentrating, Plaintiff admitted he liked to read magazines pertaining to music and could watch television three to four hours per day (Docket No. 14, p. 335 of 696). Plaintiff also told Dr. Davis that he could cook for himself, do the dishes and laundry, and help clean the house (Docket No. 14, p. 335 of 696). He also reported being able to bathe, change his clothing, and dress himself daily (Docket No. 14, p. 335 of 696). While Plaintiff presented as being very limited intellectually, Dr. Davis noted that Plaintiff was "able to do those things on a day to day basis that he *wants* to do such as studying music or running errands for his aunt or cooking meals for his mother" (Docket No. 14, p. 336 of 696) (emphasis added).

Both Drs. Finnerty and Zwissler noted that Plaintiff's work history and history of criminal activity was not consistent with someone with mental retardation (Docket No. 14, pp. 397, 415 of 696). In addition to numerous temporary jobs, Plaintiff stated that he worked as a liquor store clerk from 1985 to 1990 and only stopped working because the store went out of business (Docket No. 14, p. 145

23

of 696). During an interview with Plaintiff's mother in November 2007, a representative from the

Social Security Administration learned that Plaintiff had previously lived on his own, has no difficulty

getting along with others, knows how to drive, and keeps up with his "many, many doctors" on his

own (Docket No. 14, p. 113 of 696). Plaintiff's mother also reported that Plaintiff handles all of his

own paperwork and applications and has no difficulty reading or writing (Docket No. 14, p. 113 of

696). During a similar interview with Plaintiff's stepfather, the representative verified that Plaintiff had

indeed lived on his own for a period of time (Docket No. 14, p. 114 of 696). Plaintiff could reportedly

catch the bus without assistance and "[p]retty much handles his own money and finances" (Docket No.

14, p. 114 of 696). Plaintiff's reading and writing ability is evidenced by his ability to complete a

Social Security information sheet about his daily activities as recently as February 2010 (Docket No.

14, pp. 190-96 of 696). In this same form, Plaintiff admitted that he is able to pay bills, count change,

and use a checkbook (Docket No. 14, p. 193 of 696).

     During the CDIU investigation, Plaintiff made no mention of suffering from mental retardation

or any other psychological impairment (Docket No. 14, p. 363 of 696). He reported being able to

manage his own personal needs including personal care, hygiene, and food preparation, and being able

to perform daily household chores such as cooking, cleaning, and doing laundry (Docket No. 14, p.

362 of 696). Plaintiff also reported getting together with friends and playing in a band (Docket No. 14,

p. 362 of 696). The investigator noted that Plaintiff was clear and concise and had no trouble

communicating (Docket No. 14, p. 362 of 696). Furthermore, Plaintiff's doctors always reported that

Plaintiff was oriented to person, place, and time, with a normal mood and affect (Docket No. 14, pp.

208-647 of 696). During a cardiology evaluation prior to Plaintiff's knee surgery in February 2011, the

doctor noted that Plaintiff was cooperative, alert, and oriented and displayed appropriate mood,

memory, and judgment (Docket No. 14, pp. 535-37 of 696).

Plaintiff argues that the ALJ did not perform an analysis of his adaptive functioning sufficient to determine whether or not Plaintiff still met Listing 12.05(C) and instead simply based her decision on Dr. Davis' updated diagnosis of borderline intellectual functioning (Docket No. 19, pp. 8-12 of 16). While the Magistrate agrees that ALJ Vitellio could have included more facts in her decision relevant to Plaintiff's adaptive functioning, the Magistrate also finds that the ALJ did indeed sufficiently discuss Plaintiff's adaptive functioning in addition to recognizing Dr. Davis' opinion (Docket No. 14, p. 34 of 696). It is widely recognized that "an ALJ is not required to discuss or summarize every piece of evidence in the record." *Szymanski v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 117096, *22-23 (N.D. Ohio 2011). ALJ Vitellio's analysis, as well as her statement that she considered all evidence of record, is enough to satisfy the ALJ's duty to discuss and determine Plaintiff's potential medical improvement. Therefore, Plaintiff's argument that ALJ Vitellio did not engage in the proper analysis to determine whether Plaintiff met the standard for medical improvement is without merit. As such, the Magistrate recommends that the decision of the Commissioner be affirmed.

## 2.    RESIDUAL FUNCTIONAL CAPACITY

In his second assignment of error, Plaintiff alleges that the ALJ erred in her assessment of Plaintiff's residual functional capacity by failing to consider Plaintiff's experience of pain or the more restrictive mental limitations identified by Dr. Davis (Docket No. 19, pp. 12-14 of 16). In response, Defendant alleges that the ALJ's residual functional capacity determination is supported by substantial evidence (Docket No. 20, pp. 15-17 of 19). Upon review of the record, the Magistrate agrees with Defendant.

To properly determine a claimant's ability to work and the corresponding level at which that work may be performed, the ALJ must determine the claimant's residual functional capacity. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). According to Social Security Regulations, residual functional capacity is designed to describe the claimant's physical and mental work abilities. *Id*. Residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a).

To determine a claimant's residual functional capacity, the Commissioner will make an assessment based on all relevant medical and other evidence. 20 C.F.R. § 20.1545(a)(3). The Commissioner bears the responsibility of developing the claimant's complete medical history. 20 C.F.R. § 20.1545(a)(3). The Commissioner "will consider any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. [The Commissioner] will also consider descriptions and observations of [a claimant's] limitations from [his] impairment(s), including limitations that result from [his] symptoms, such as pain, provided by [claimant], [his] family, neighbors, friends, or other persons." 20 C.F.R. § 20.1545(a)(3). Responsibility for deciding residual functional capacity rests with the ALJ when cases are decided at an administrative hearing. *Webb*, 368 F.3d at 633.

Plaintiff first alleges that ALJ Vitellio failed to consider Plaintiff's "well documented somatic problems" (Docket No. 19, p. 13 of 16). In 1990, Dr. Davis diagnosed Plaintiff with a somatization disorder, noting that Plaintiff was "very concerned about numerous things wrong with him physically and seem[ed] to spend most of life going to doctors and discussing his physical problems" (Docket No. 14, p. 211 of 696). During his 2007 evaluation, Dr. Davis again noted that Plaintiff was "very much

26

concerned about those things wrong with him physically," but did *not* make mention of nor officially diagnose any type of somatization disorder (Docket No. 14, pp. 332-38 of 696). In fact, *no* doctor, including the state examiners, made such a finding or diagnosis after Dr. Davis' initial 1990 finding (Docket No. 14, pp. 208-647 of 696). While Plaintiff concludes that his "somatic focus exacerbates his experience of pain and other symptoms" (Docket No. 19, p. 13 of 16), this appears to be Plaintiff's own conclusion, not the documented opinion of any medical source any time after 1990.

Plaintiff alternatively argues that his mental and cognitive functioning is more limited than what ALJ Vitellio determined in her residual functional capacity assessment (Docket No. 19, pp. 13-14 of 16). The ALJ determined that Plaintiff could perform unskilled light work with the addition of a sit/stand option, likely to account for Plaintiff's hip and knee difficulties (Docket No. 14, p. 32 of 696). Unskilled work is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a).

Here, Dr. Davis opined that Plaintiff was: (1) mildly impaired in his ability to relate satisfactorily to others; (2) moderately to markedly impaired in his ability to understand and follow simple instructions; (3) moderately to markedly impaired in his ability to perform simple repetitive tasks; and (4) mildly to moderately impaired in dealing with stress and pressure (Docket No. 14, p. 338 of 696). While Plaintiff concentrates on Dr. Davis' note that Plaintiff had difficulty following simple instructions during the evaluation and performed tasks slowly with some errors, Dr. Davis did not actually conclude that Plaintiff would not be able to handle these tasks in a work environment (Docket No. 14, p. 338 of 696). In fact, Dr. Davis specifically concluded that Plaintiff "probably would be able to understand and follow some simple instructions" (Docket No. 14, p. 338 of 696). Plaintiff himself admitted that he graduated from high school (Docket No. 14, p. 685 of 696), has sought and held

approximately twenty to thirty temporary jobs (Docket No. 14, p. 684 of 696), and can understand

what he reads if it is not too difficult (Docket No. 14, pp. 687-88 of 696). Furthermore, when asked by

the ALJ what prevents him from working, Plaintiff listed only physical health issues, not mental

limitations (Docket No. 14, p. 656 of 696). Plaintiff is also able to handle his own money and finances,

complete Social Security Disability forms, pay bills, count change, and use a checkbook (Docket No.

14, pp. 114, 190-96 of 696).

      While Plaintiff may choose to interpret such results differently than the ALJ and urges this

Court to do the same, the Sixth Circuit has repeatedly held that

> a court's review of the [ALJ's] decision is limited to whether the ALJ applied the correct
> legal standards and whether the findings of the ALJ are supported by substantial evidence.
> The substantial-evidence standard is met if a reasonable mind might accept the relevant
> evidence as adequate to support a conclusion. The substantial-evidence standard
> presupposes that there is a zone of choice within which the decisionmakers can go either
> way, without interference by the courts. Therefore, if substantial evidence supports the
> ALJ's decision, the court defers to that finding even if there is substantial evidence in the
> record that would have supported an opposite conclusion.

*Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405-06 (6th Cir. 2009). While Plaintiff may disagree

with ALJ Vitellio's findings with regard to Plaintiff's residual functional capacity, the Magistrate finds

the ALJ's conclusions to be well within the "zone of choice" based upon the supplied evidence.

Therefore, Plaintiff's second assignment of error concerning his residual functional capacity

assessment is without merit and the Magistrate recommends that the decision of the Commissioner be

affirmed.

## VIII. CONCLUSION

For the foregoing reasons, this Magistrate recommends that the decision of the Commissioner be affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   December 17, 2013

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.